**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-16-0000661**
**29-SEP-2017**
**08:24 AM**

NOS. CAAP-16-0000661 and CAAP-16-0000662

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

**CAAP-16-0000661**
IN THE INTEREST OF CH; MM
(FC-S NO. 13-00059)

---

IN THE INTEREST OF MM
(FC-S NO. 14-00222)

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT

AND

**CAAP-16-0000662**
IN THE INTEREST OF CH; MM

---

IN THE INTEREST OF MM
(FC-S NO. 14-00222)

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT

SUMMARY DISPOSITION ORDER
(By: Leonard, Presiding Judge, Ginoza and Chan, JJ.)

Mother-Appellant (Mother) and Father-Appellant (Father) (collectively, Parents) separately appeal from the Order Terminating Parental Rights (Order), entered by the Family Court of the First Circuit (family court) on October 5, 2016,[1] which granted the Motion to Terminate Parental Rights filed by the Department of Human Services (DHS) and terminated the parental and custodial rights of Mother and Father to their children, MM1

---

[1] The Honorable Catherine H. Remigio presided.

and MM2.

Father argues that the family court erred in terminating his parental rights (1) based on insufficient evidence that he was not willing and able to provide a safe family home for MM1 and MM2 even with the assistance of a service plan, and he would not become willing and able to do so within the reasonably foreseeable future; (2) because DHS contributed to his failed attempt to reunify with CH, Mother's child from another relationship; and (3) because the Permanent Plan with the goal of adoption by MM1 & MM2's current resources caregivers is not in MM1 and MM2's best interests.

Mother argues that the family court erred in terminating her parental rights (1) based on insufficient evidence that she was unwilling and unable to provide MM1 and MM2 with a safe family home, even with the assistance of a service plan, and she would not become willing or able to do so within the reasonably foreseeable future; and (2) because the Permanent Plan with the goal of adoption by MM1 & MM2's current resources caregivers is not in MM1 and MM2's best interests.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother and Father's respective points of error as follows.

 I. **The family court was not wrong to terminate Father's parental rights.**

Father contests Findings of Fact (FOFs) 149/153[2] and 150/154,[3] which are actually Conclusions of Law (COLs), and COLs

---

[2] Parts of MM1 and MM2's respective FOF/COLs are identical except for the numbering and/or child referred to. Where the numbers for the same FOF are different, the opinion includes the number in MM1's FOF/COL followed by the number in MM2's FOF/COL. Where the number is the same, the opinion includes only one number.

[3] The FOFs provide:

  [149/153]. Father is not presently willing and able to provide [MM1/MM2] with a safe family home, even with the assistance of a service plan.
  [150/154]. It is not reasonably foreseeable that

9 and 10[4] on the ground that they are based on the following FOFs, which he maintains are clearly erroneous.

FOF 126/130[5] is based on substantial evidence. DHS social worker Barry Kwock (Kwock) testified that while Mother was in prison, Father did not engage in services because, as he admitted, he had trouble coping with Mother being gone. Father testified that he had no explanation for his failure to participate in random urinalysis (UA) while Mother was in prison except that he was confused about what was happening in the case and had lost hope. He did not engage in services because he lacked a phone, could not contact his attorney for directions, and had no service plan until 2015. He did not ask Kwock for the service plan when he saw him at his weekly visits with MM1 and MM2 because he did not think it was important, was focused on his daughters and Mother's release, and talking to Kwock triggered his anger.

FOFs 124/128, 138/142, and 141/145[6] are based on

_____

Father will become willing and able to provide [MM1 and MM2] with a safe family home, even with the assistance of a service plan, within a reasonable period of time not to exceed two years from [MM1's and MM2's] date of entry into foster care.

[4] The COLs provide:

    9. [Parents] are not presently willing and able to provide [MM1 and MM2] with a safe family home, even with the assistance of a service plan.
    10. It is not reasonably foreseeable that [Parents] will become willing and able to provide [MM1 and MM2] with a safe family home, even with the assistance of a service plan, within a reasonable period of time.

[5] The FOF provides, "Father refused to engage in services during Mother's incarceration and it was not until June 2015 that Father decided to re-engage in services, thereby demonstrating his dependency on Mother."

[6] The FOFs provide:

    [124/128]. Father denies any part or responsibility in the physical harm to [CH]. Father's attitude is based in part on the fact that [CH] is not his child. Father described his relationship with [CH] as like a father figure, but not like his own children, because it's different with [sic] it's your own.
. . . .
    [138/142]. Father completed multiple parenting programs, including the Ka Pa'alana Program, [CCSS], and PARENTS, Inc., however, Father is unable to demonstrate his

substantial evidence. Kwock testified that he was concerned about Father's ability to protect MM1 and MM2 and that Father would not disclose to DHS harm caused by Mother to MM1 and MM2 because Father had tried to hide Mother's abuse of CH in the past.

CH reported that on October 3, 2014, Father[7] hit his cheek (10/3/14 Abuse), bruising it. CH appeared to be afraid of Father so DHS asked Father to leave for a week, which Father agreed to. However, three days later, Father was found with Mother and the children. CH reported that on October 26, 2014 (10/26/14 Abuse), Father held him down while Mother hit him on the bottom with a stick. The abuse created open wounds on his buttocks.

Father testified that when the 10/26/14 Abuse occurred, he was in another room and did not see what was happening. He did not check to see if CH was okay. He was more concerned about MM1 and MM2 being taken away if Mother continued hitting CH than he was about how CH was reacting or if he was in pain. He yelled at Mother to stop because their daughters could be taken away. Kwock testified that Father later saw the wounds on CH's bottom and claimed he did not know why they were there. Father surmised that CH may have been scratching himself and/or had rubbed his bottom against a car seat that had brackets on it.

Father testified that although he and CH had a close, father-and-son relationship, it was different than his relationship with his biological children. He tried to let Mother guide CH.

FOF 140/144[8] is based on substantial evidence. Kwock testified that Father had not cooperated throughout the case. Father withheld information and tried to cover up for Mother when

---

ability to be protective of [MM1 and MM2] in that he allowed Mother to inflict physical harm to [CH].
. . . .
[141/145]. Father continues to minimize the severity of the physical harm to [CH].

[7] CH ultimately identified Mother as the one who hit him.

[8] The FOF provides, "Father has not been truthful and forthcoming throughout the pendency of this case."

Kwock investigated the abuse to CH. Father admitted in his testimony that when Kwock tried to take MM2 into custody, Father avoided him. Kwock testified that Father did not report his positive drug-test results to Kwock or take "ownership" of his substance abuse. Father tested positive for methamphetamine (meth) in March, June, and September 2014, but claimed the results were all inaccurate and he had not used illegal drugs since 1999.

FOFs 142/146, 143/147, and 144/148[9] are not clearly erroneous. Kwock testified that although Father complied with services, Father did not understand why they were recommended. With regard to Father's substance-abuse issues, Father testified that he had last used illegal drugs, including meth, marijuana, and cocaine, in 1999. In June, 2014, he tested positive for meth and marijuana, but claimed he had taken no drug except cough medicine. Father also testified did not know why he tested positive for amphetamine on September 12, 2014, but it may have been because he consumed a Monster drink before being tested. According to Father, quitting was not difficult, and he did not need substance-abuse treatment. Kwock testified that although Father had completed the random UA program and did not have a substance-abuse issue at the time of trial, he had been dishonest about his substance-abuse in the past and had not fully addressed his substance-abuse issues.

With regard to Father's anger problems, although Father testified that he had resolved them through his anger management program, Kwock testified that Father had unresolved anger issues.

With regard to Father's lack of protectiveness, Kwock testified that Father believed Mother had not been using drugs when she tested positive for amphetamine after giving birth to

---

[9] The FOFs provide:

> [142/146]. Father refuses to recognize the safety issues he has, including substance abuse problems, domestic violence issues, and his inability to be protective of [MM1 and MM2].
> [143/147]. Father is not committed to meaningfully engaging in services.
> [144/148]. Father lacks insight and continues to contend that he has no issues.

MM1 and that Mother's diabetes had created a false result. He later suggested that the hospital, Kapiolani Medical Center (Kapiolani), had tampered with the sample. Father testified that Mother was not using drugs when she tested positive for meth on November 9, 2014 and February 21, 2016, and she did not need substance-abuse treatment.

As discussed, when Mother was abusive toward CH, Father showed a lack of concern for CH and presented alternative explanations for CH's injuries. Further, following the 10/26/14 Abuse, Father tried to keep MM2 away from the social worker who tried to take custody of her on DHS's behalf.

FOFs 148/152, 158/162, and 159/163[10] are not clearly erroneous. Father argues that DHS should have granted his reasonable request for increased visits with MM1 and MM2. However, there is no evidence in the record on appeal that Father ever requested increased visits.

Father argues that DHS contributed to his failure to reunify with MM1 and MM2 because DHS failed to provide CH with recommended individual therapy until September 20, 2014, despite Parents' repeated requests for it months before that date, and failed to refer Mother and CH to a therapist for recommended conjoint therapy. A November 1, 2013 DHS Family Service Plan recommended conjoint therapy for Mother and CH when CH's therapist deemed it appropriate, in order to address Mother's problems parenting CH. At trial, Kwock admitted that he failed to include the therapy recommendation in any subsequent service

---

[10]  The FOFs provide:

> [148/152]. Under the circumstances presented in this case, Father was given every reasonable opportunity to effect positive changes to provide a safe family home and to reunify with [MM1/MM2].
> [158/162]. Under the circumstances presented in the instant case, DHS has exerted reasonable and active efforts to reunify [MM1/MM2] with [Parents] by identifying necessary, appropriate, and reasonable services to address the identified safety issues, and making appropriate and timely referrals for these services.
> [159/163]: Under the circumstances presented by the instant case, DHS gave [Parents] every reasonable opportunity to succeed in remedying the problems which put [MM1/MM2] at substantial risk of being harmed in the family home, and to reunify with MM1/MM2].

plan, although he had discussed the recommendation with Mother. By the time of trial, Mother had found a conjoint therapist. Kwock did not know if a therapy session had been held.

This case concerns the termination of Parents' parental rights to MM1 and MM2, not Mother's stipulation to the termination of her parental rights over CH. Father has failed to show how the alleged omissions regarding CH contributed to his loss of parental rights over MM1 and MM2.[11] Thus, any error on the family court's part in granting the MTPR on these grounds was harmless.

Father argues that FOFs 54/58, 55/59, 60/64, and 154/158[12] are clearly erroneous because it is not in the best interest of MM1 and MM2 to be adopted by their maternal grandmother (Grandmother) in light of Mother's statements in her October 24 and 25, 2013 psychological evaluation and Parents statement to DHS that Grandmother's husband drove while drinking. The August 26, 2015 (8/26/15) Safe Family Home Report provides that CH, MM1, and MM2 were bonding with Grandmother and her family. The children loved each other, were in good health, and had been placed in "the least restrictive and most homelike

---

[11] If Father means to argue that had DHS provided the therapy in a timely manner, Mother would not have abused CH, there would have been no risk of harm to MM1 and MM2 by Mother, and Father would not have failed to protect MM1 and MM2, the argument is not supported by the record on appeal. As argued by the State, the record does not indicate that Mother or Father requested that DHS provide therapy for CH or conjoint therapy for Mother and CH. In fact, at the ʻOhana conference on 7/15/14, the notes indicate that Parents needed to secure medical insurance for CH in order to obtain therapy.

[12] The FOFs 54/58, 55/59, and 60/64 provide:

> [54/58]. [MM1 and MM2] [are] doing well in [their] current placement and ha[ve] bonded with [their] resource caregivers, who are able to meet all of [their] physical, medical, emotional, and psychological needs.
> [55/59]. DHS did not abuse its discretion in placing . . . [MM1 and MM2] with [their] relative resource caregiver[s].
> . . . . .
> [60/64]. To be returned to the care of [their] Mother and/or Father would not be in the best interests of [MM1 and MM2].

FOF 154/158 provides, "The Permanent Plan dated August 19, 2015, assists in achieving the ultimate goal of the Permanent Plan, which is adoption into an appropriate home."

environment, in the closest proximity as possible to the family home, considering the family's situation and the placement options available . . . at the time of placement." The maternal grandparents had been the DHS-licensed, relative, resource caregiver earlier in the case and were willing and able to help with the children and committed to meeting their needs.

At trial, Kwock testified that he was aware of Mother's allegations against Grandmother in the psychological evaluation but still believed Grandmother was an appropriate caregiver. Grandmother met all of DHS's requirements and passed the home study. Kwock had never seen Grandmother exhibit the kind of behavior Mother had described.

It was in the family court's discretion to credit Kwock's testimony and accord it and the 8/26/15 Safe Family Report more weight than Mother's allegations. See In re Doe, 95 Hawaiʻi 183, 190, 20 P.3d 616, 623 (2001) (noting that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence, as such is the province of the trier of fact).

FOFs 149/153 and 150/154 and COLs 9 and 10 are not clearly erroneous as to Father. See id. (a family court's determinations pursuant to HRS § 587-73(a) are reviewed on appeal for clear error).

II.    The family court was not wrong to terminate Mother's parental rights.

Mother contests COLs 9 and 10 on the ground that they are based on clearly erroneous FOFs.

FOFs 51 and 65/69[13] are based on substantial evidence. At trial, Kwock testified that the case was opened after Kapiolani reported both Mother and MM1 tested positive for amphetamine. The family court admitted into evidence State's Exhibit 15, Mother's birth record from Kapiolani. The birth

---

[13]    FOF 51 provides, "[MM1] tested positive for Amphetamines upon birth." FOF 65/69 provides, "Mother tested positive for amphetamines upon giving birth to [MM1] on April 2, 2013, however, Mother denied using any drugs."

record indicates "mom, baby positive u tox screen for amphetamines." A DHS child/adult protective services specialist, Lisa Kunioka (Kunioka), who visited Kapiolani after Mother gave birth, testified that a hospital social worker told her that Mother and MM1 tested positive for amphetamines. A lab confirmed the presumptive positive test result. Mother provides no authority to support the notion that DHS was required to provide additional evidence regarding the validity of the positive test result, and we find none. Further, this court declines to pass upon the family court's determination regarding the weight of evidence. See In re Doe, 95 Hawai'i at 190, 20 P.3d at 623 (noting that an appellate court will not pass upon issues dependent upon the weight of the evidence, as such is the province of the trier of fact).

FOFs 79/83 and 80/84[14] are based on substantial evidence. Mother argues the FOFs are clearly erroneous to the extent they reflect that the family court faulted her for failing to engage in services while incarcerated. She maintains that she did not participate because services were unavailable in prison. Mother did not make this argument below, therefore, it is waived on appeal. See Rule 28(b)(4) Hawai'i Rules of Appellate Procedure.

FOF 96/100[15] is based on substantial evidence. Mother argues that the evidence adduced at trial showed she completed many of her services and continued to participate in others, and her visits with MM1 and MM2 were going well. Kwock testified that Mother's parenting ability was a concern because despite finishing the parenting program, she had harmed CH. Thus, she was unable to demonstrate what she had learned. She lacked

---

[14] The FOFs provide:

> [79/83]. Mother was incarcerated from November 2014 through September 2015 for convictions related to her physical abuse of [CH].
> [80/84]. While Mother was incarcerated, she did not engage in any of the recommended services.

[15] The FOF provides, "Mother completed multiple parenting programs, including the Ka Pa'alana Program; [CCSS]; and PARENTS, Inc.; however, Mother is unable to demonstrate and effectively apply the skills learned, as evidenced by her physical abuse to [CH]."

insight into the role the services were playing and how she was harming her children. She admitted in her testimony that she only participated in domestic violence services because she was ordered to do so.

Mother argues that the family court unfairly considered the children "generally" rather than individually. She does not elaborate on this argument, and its precise meaning is unclear. If she means to argue that the court erred in considering her parenting of CH when determining whether to terminate her parental rights to MM1 and MM2, such argument lacks merit. Mother's parenting of CH was relevant to whether she was willing and able to provide a safe home to MM1 and MM2, even with the assistance of a service plan, and whether she would be willing and able to do so in the reasonably foreseeable future (i.e., if she had domestic-violence and substance-abuse issues, acknowledged the risk of harm the issues posed to MM1 and MM2, and appreciated the value of services to address the issues).

If Mother means that the family court erred by considering MM1 and MM2 as a single unit, this argument lacks merit as well. The family court issued FOFs/COLs, tailored to each child, in each case. There was no need for the family court to distinguish further between MM1 and MM2 because the court's decision to terminate Mother's parental rights was not based on direct harm to MM1 and MM2 but, rather, Mother's failure to accept that she had domestic-violence and substance-abuse issues, acknowledge the risk of harm these issues posed to MM1 and MM2, and appreciate the value of services to address these issues.

Mother argues that FOF 158/162[16] is clearly erroneous because DHS failed to tailor services to address the safety issues. Specifically, she alleges that DHS failed to refer CH to an individual therapist until September 2014, despite Parents'

---

[16] The FOF provides:

> [158/162]. Under the circumstances presented by the instant case, DHS has exerted reasonable and active efforts to reunify [MM1 and MM2] with [Parents] by identifying necessary, appropriate, and reasonable services to address the identified safety issues, and making appropriate and timely referrals for these services.

repeated requests for one in the months leading up to that date, and never referred CH and Mother to the recommended conjoint therapy. However, Mother has not demonstrated that the omissions contributed to the termination of her parental rights.[17] In light of Mother's failure to demonstrate progress after taking part in the services DHS did recommend, the omissions were harmless.

Mother argues that FOFs 54/58, 55/59, 153/157, and 154/158[18] are clearly erroneous because the court ordered the Permanent Plan based on insufficient evidence that it was in MM1 and MM2's best interests, where the court sought to enable Parents to continue visiting MM1 and MM2. At trial, after orally granting the MTPR, the family court found that MM1 and MM2 were bonded with Parents and would not understand suddenly losing contact with them, and the court understood that DHS intended to allow Parents to maintain contact with MM1 and MM2 even if they were adopted. The family court ordered an ʻOhana conference so the parties could mediate conflicts between the maternal grandparents and Parents to allow for continued visitation. The family court's finding that visitation with MM1 and MM2 should continue and its decision to terminate parental rights do not

---

[17] If Mother means to argue that had DHS provided the therapy in a timely manner, Mother would not have abused CH and, therefore, would not have presented a risk of harm to MM1 and MM2, the argument is not supported by the record on appeal. As argued by the State, the record does not indicate that Mother or Father requested that DHS provide therapy for CH or conjoint therapy for Mother and CH. In fact, at the ʻOhana conference on 7/15/14, the notes indicate that Parents needed to secure medical insurance for CH in order to obtain therapy.

[18] The FOFs provide:

> [54/58]. [MM1 and MM2] [are] doing well in [their] current placement and ha[ve] bonded with her resource caregivers, who are able to meet all of [their] physical, medical, emotional, and psychological needs.
> [55/59]. DHS did not abuse its discretion in placing . . . [MM1 and MM2] with [their] relative resource caregiver.
> . . . .
> [153/157]. . . . . The goal of adoption is in accord with the statutory presumption that the goal of adoption in a proposed permanent plan is in a child's best interests. HRS §§ 587A-32(a)."
> [154/158]. The Permanent Plan dated August 19, 2015, assists in achieving the ultimate goal of the Permanent Plan, which is adoption into an appropriate home.

contradict each other nor express ambivalence on the part of the family court.

Mother also argues, as expressed in her psychological evaluation, that Grandmother is unable to care for MM1 and MM2 appropriately. As discussed, the family court had the discretion to credit Kwock's testimony and accord more weight to it and the information in the 8/26/15 Safe Family Report than Mother's allegations.

COLs 9 and 10 are not clearly erroneous as to Mother.

### III. The remaining FOFs contested by Mother and/or Father are not clearly erroneous.

Parents contest FOF 45/51,[19] which is not clearly erroneous because it accurately summarizes the contents of the family court's October 5, 2016 Order.

Father contests FOF 151/155,[20] which is clearly erroneous in that the expert opinion it describes was not presented at trial. Nevertheless, the error is harmless because even without it, the remaining FOFs provide substantial evidence to support the Order.

---

[19] The FOF provides:

> Also on October 5, 2016, the Court granted DHS' [TPR Motion]. Pursuant to HRS § 587A-33(a), the Court found by clear and convincing evidence that: (1) [Parents] are not willing and able to provide [MM1 and MM2] with a safe family home, even with the assistance of a service plan; (2) it is not reasonably foreseeable that [Parents] will becom[e] willing and able to provide [MM1 and MM2] with a safe family home, even with the assistance of a service plan, within a reasonable period of time; and (3) the proposed Permanent Plan dated August 19, 2015, is in the best interests of [MM1/MM2]. The Court terminated the parental rights of [Parents]; awarded permanent custody of [MM1/MM2] to DHS; and ordered the Permanent Plan dated August 19, 2015.

[20] The FOF provides:

> Based on the credible expert testimony presented at trial, it is important for parents involved in child welfare cases to develop insight into their problems (safety issues) and the cause of their problems in order to facilitate in making positive lifestyle changes that would allow them to provide a safe family home for their child. Lack of insight negatively impacts a parent's ability to resolve the parent's problems.

Mother contests FOF 152/156,[21] which is not clearly erroneous because it accurately reflects the contents of the FOF/COLs.

Mother contests FOFs 153/157 and 154/158,[22] which are not clearly erroneous because they accurately reflect the goal of the Permanent Plan.

Mother contests FOF 155/159,[23] which is not clearly erroneous because it accurately reflects the guardian ad litem's recommendation.

Mother contests FOF 166/170,[24] which is a credibility determination, which this court declines to review. See In re Doe, 95 Hawai'i at 190, 20 P.3d at 623.

Therefore, IT IS HEREBY ORDERED that the Order Terminating Parental Rights, entered by the Family Court of the First Circuit, on October 5, 2016, is affirmed.

DATED: Honolulu, Hawai'i, September 29, 2017.

On the briefs:

Korrine S.S. Oki,
for Father-Appellant.

Thomas A.K. Haia,
for Mother-Appellant.

Julio C. Herrera,
Jay K. Goss,
Asami M. Williams,
Deputy Attorneys General,
for Department of Human
Services, Petitioner-Appellee.

Presiding Judge

Associate Judge

Associate Judge

---

[21] The FOF provides, "Having made the 'parental unfitness' [FOFs], pursuant to HRS §§ 587A-33(a)(1) and (2) regarding [Parents], the Court makes the following [FOFs] regarding the Permanent Plan dated August 19, 2015."

[22] The FOF provides, in relevant part, "The goal of the Permanent Plan is permanent custody of [MM1/MM2], with the ultimate goal of adoption."

[23] The FOF provides, "[MM1's/MM2's] [guardian ad litem] recommended that permanent custody of [MM1/MM2] be awarded to the DHS and that the Permanent Plan dated August 19, 2015, be ordered."

[24] The FOF provides, "Mother's testimony was found by the court to be not credible."